S. H. ROBINSON & CO., INC., v. LARUE.—156 S. W. (2d), 359.

Eastern Section.   August 9, 1941.

Petition for Certiorari denied by Supreme Court, November 29, 1941.

Jennings & O'Neil, of Knoxville, for plaintiff in error.
W. O. Lowe, of Knoxville, for defendant in error.

PORTRUM, J.  The plaintiff below, Joe Larue, sues his former employer, S. H. Robinson & Company, Incorporated, for a violation of the federal statute known as ''Fair Labor Standards Act of 1938,'' 29 U. S. C. A., sec. 201 et seq., to recover the minimum standard wage provided by the act for the number of hours worked weekly and in addition for overtime, as provided in the act, and a penalty of double the amount found due him after crediting the amount paid him. The defense is that the employer was not engaged in interstate commerce, and the employee was not employed in interstate business, but he was employed in intrastate business.  That the act did not apply to him, and he had not put in the hours in excess of the minimum required by the act.

For the employees engaged in interstate commerce, the act fixes the minimum hours per week at forty-two hours, and the minimum wage per hour at thirty cents; and overtime work the wage is fixed at one and one-half times the minimum wage, or forty-five cents per hour. And an employer who violates these provisions by failing to conform to the law and pay the wages required for the time worked is penalized by allowing the employee to recover the amount due him under

the standard, plus a penalty of 100 per cent. of the amount due, which is designated in the act as liquidated damages, together with attorney's fees and cost.

The plaintiff sought to recover in this action the sum of $1,792.55. He was employed as a night watchman guarding the place of business of the defendant and claims to have put in 13½ hours per day, seven days per week, for a period of 37 weeks. The employer is engaged in the business of collecting, grading, and selling junked metal, consisting of iron scraps, aluminum, brass, and copper scraps, and he or it also maintains under a trade name similar in character a plumbing shop with the necessary supplies, et cetera. This is a local business operated under a separate license, and it is claimed that the employee was employed to guard and protect this plumbing business, and it is further claimed that the junk business was primarily a local and intrastate business and that it was only incidentally engaged in the interstate business.

The case was heard by the trial judge without the intervention of a jury, and the case is here to be heard de novo. The trial court held that the defendant was engaged in interstate commerce and its employees were entitled to the benefits of the act. And that a night watchman guarding its premises, protecting the product being shipped in interstate commerce, was performing an essential duty necessary to the operation of the interstate business, and was protected by the act.

This court concurs in the conclusion that the defendant's business was interstate. Its yards where the junk was deposited and graded in preparation for reshipment covered a city block, and the metal was shipped in carload lots. Some of the shipments were interstate and some were intrastate, but the character of the product collected and sold was such that its use was primarily for munitions of war, and the demand for the scrap was not local or state use, other than its preparation for munition purposes. In war times, as this is, scrap metal of iron, aluminum, brass and copper is a commodity intended to pass in interstate and foreign commerce. He who deals extensively in it can neither hope for nor expect a local market, because, first, there is no local use for it and, second, the local market cannot outbid a foreign or national market.

This conclusion is supported by the defendant for it recognized its character of business and complied with the law in reference to its employees engaged in the assembly, grading and shipping of the commodity, and it carried upon its books, along with the other employees, the plaintiff's time as a night watchman, but it arbitrarily designated his time as six hours per day, and his wage at $12 per week, and as reflected by the books the company had complied with the wage and hour law in reference to the plaintiff. It attempts to explain this by stating that the officer representing the insurance company carrying

its insurance had required it. If so, it was because the defendant was thought to be engaged in interstate commerce and the employee was entitled to the benefits of the act and his hours and wages should be reflected by the books.

It is next insisted that the plaintiff's duties did not pertain to interstate business but were local in character in that he was employed to and did guard the defendant's plumbing business solely, which is a local business. Prior to the plaintiff's employment the company had installed time or punch boxes over its yards which made it necessary for a watchman to cover a certain route regularly at a specified time and punch the clock which insured the watchman's patrolling the yards regularly. At the time of the employment, the company had abandoned these clocks and had constructed a fence seven to ten feet high and this protected the large quantity of scrap iron which was of small value locally. The purchase price of scrap metal does not reflect a sales value, and scrap metal being a commodity at this time in demand by a certain class of people who gather up abandoned metal here and there and large quantities of it could be thrown over the fence in the nighttime and carried away, and its value was sufficient to justify the company's maintaining a night watchman to guard it. The more valuable metal of the lot, brass and copper, was locked in a building on the premises, but if this building was unguarded it could be broken into and valuable quantities carried away, and this fact justified the company in maintaining a watchman. The defendant thought it necessary to guard these premises prior to the plaintiff's employment and after his discharge, but has now installed throughout the buildings and the yards an electric beam and when this beam is broken by an intruder a police alarm is given unknown to the intruder which facilitates his capture.

The plaintiff testifies that his duty was to guard the yards and the buildings, as well as the plumbing supplies. If it were necessary to guard the plumbing supplies, then it is not practicable for a company to employ a night watchman to guard these supplies without also guarding its other valuable products upon the same premises.

Turning to the next contention, it is said that a night watchman of scrap iron performs no duties pertaining to interstate commerce and that he is not protected by the act. We have numerous decisions of the District Federal Court dealing with the question of a night watchman of plants engaged in interstate commerce, and determining his status as an interstate or intrastate employee. Where a night watchman has to perform other duties, such as keeping up steam in the engine boilers, he is classified as an employee engaged in interstate commerce; and we have other cases where the night watchman's only duty is to guard commerce moving in interstate or foreign commerce, and depending somewhat upon the character of the business, that is whether it is in fact interstate commerce, he is classified as an

employee engaged in interstate commerce. We can find no holding of a district court adjudicating that a night watchman engaged in the protection of goods flowing in interstate commerce was not entitled to the benefits of the act, when his employer is engaged in interstate business. The case of Schrieber v. Kane Service (U. S. District Court, N. O. Ill.), Vol. 3, Wage and Hour Reporter, page 459, does not seem to be in point, for the employer was engaged in the local business of providing night watchmen and patrolmen service in the city of Chicago to firms engaged in interstate or intrastate business, and the employer's business was local. There was no privity between the employee and the customer who was engaged in interstate commerce.

The case of Brown v. Bailey, 177 Tenn., 185, 147 S. W. (2d), 105, is not in point, for the court held the employer was not engaged in interstate commerce; this court in deciding the same case said that in the event the court should hold that the whiskey was in interstate commerce until it had reached the warehouse of the purchaser, then that the watchman's duty in watching the removal of the whiskey from the depot to the warehouse or storehouse was so insignificant that it was not an essential duty to the removal of the goods, since others were engaged in removing it from the depot to the storeroom and a watchman was unnecessary.

In classifying employees engaged in interstate commerce, the act, 29 U. S. C. A., sec. 203, provides: " 'Produced' means produced, manufactured, mined, handled, or in other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

■ The court is of the opinion that the employee, night watchman, was engaged in an "occupation necessary to the production thereof." The word "necessary" as used in the act does not mean indispensable, but means essential and beneficial.

"The definition of 'necessary' given by Chief Justice Marshall is fairly applicable. 'To employ the means necessary to an end, is generally understood as employing any means calculated to produce the end, and not as being confined to those single means, without which the end would be entirely unattainable.' McCulloch v. Maryland, 4 Wheat, 316, 413, 4 L. Ed., 579. The employees involved here cannot be excluded from the operation of the act unless the word necessary is interpreted to mean indispensable. . . ." Fleming v. Kirschbaum Co., D.C.E.D. Pa., 38 F. Supp., 204, 206.

Armed night watchmen of munitions of war and their ingredients perform a necessary, beneficial, and essential service in the pro-

duction and ultimate delivery of goods moved in interstate and foreign commerce. At this time the United States Navy is patrolling and guarding the seas, protecting ships carrying scrap metal to the British Isles for munition purposes, and no one will insist that the Navy is not performing a hazardous, necessary, and essential duty in the transportation of commerce between nations. The night watchman's service is not so beneficial, but like the guards walking the deck his services is a part of the whole.

In this case the plaintiff is entitled to the benefits of the act. What then is the measure of his recovery? The plaintiff is a disabled former workman of the defendant, and he had sought employment as a night watchman some time before he was employed. At the time of his employment he knew of the act and the probability that he was entitled to the benefits. Immediately he began to keep his time, and secretly extend his hours of service, but never making any complaint to his employer in reference to his hours of pay. The trial judge held that he established his evidence after the institution of the suit by attempting to make entries of his time upon his calendar from day to day in an attempt to increase his hours of service, but after reviewing the evidence the trial judge came to the conclusion that he had put in about forty-two hours overtime for each week for a period of thirty-four weeks. And upon this basis he rendered judgment.

The plaintiff testified that he worked from the first of January until the middle of September, and that he came to work at 5 o'clock in the afternoon and worked until 6:30 in the morning, making 13½ hours per day, seven days per week. His services at a watchman were not needed so long as the office force was on duty, and the defendant shows that some member of the force was there until 6 o'clock in the afternoon, and came on at 5 o'clock the next morning. In view of the plaintiff's purpose to increase his overtime the court discards his testimony in reference to his working hours while the force was still on duty, and adopts the evidence of the defendant. We allow him time from 6 p. m. until 5 a. m., totalling eleven hours per day, or seventy-seven hours per week. The minimum hours as provided by statute was forty-two hours per week, which subtracted from seventy-seven, leaves twenty-five hours overtime. He was entitled to 30 cents per hour for forty-two hours each week, making the sum of $12.60. And for the overtime of twenty-five hours per week he was entitled to 45 cents per hour, making the sum of $11.25 per week. Adding his straight and overtime he was entitled to $23.85 per week and was paid $12 per week, leaving due him per week $11.85. The trial judge held that he worked thirty-four weeks, and thirty-four times $11.85 equals $402.90. This is the sum he was entitled to recover as wages due and unpaid. And to this must be added the 100 per cent. penalty of $402.90, equaling $805.80. The trial judge

granted an attorney's fee of $300, under the provisions of the act, and when added to the above makes a grand total of $1,105.80. The judgment of the lower court will be reduced to this amount, and as thus modified the judgment will be affirmed.

The attorney for the plaintiff below makes an application here for the allowance of an additional attorney's fee for his services rendered in this court. It was necessary for the employer to prosecute this appeal to correct the judgment of the lower court, which was reduced from $1,545.60 to $1,105.80. The act does not penalize the successful party; the application is denied.

As above modified the decree of the lower court is affirmed, and the cost of the appeal will be equally divided.

### Supplemental Opinion.

It appears a mistake in subtraction was made in the original opinion. The weekly overtime is 35 hours per week instead of 25 hours. The correction will be made accordingly.

Upon further consideration the court is of the opinion the amount of the penalty allowed as attorney fees is within the discretion of the court. The plaintiff was a night watchman; he attempted to pad his overtime, and he had available a couch upon which he could, and undoubtedly did, sleep away many hours he was paid overtime. The court reduces the amount of $300 allowed as attorney fees to the nominal sum of $1, and orders that his attorney be given a lien upon the recovery for his services in the lower court and in this court. A decree will be entered conforming to this and the original opinion as corrected.

Ailor and McAmis, JJ., concur.